**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| **LISA MARIE PETTIS, HOLLY MATHEWS,** individually and on behalf of all others similarly situated, | : | **Case No. 26-CV-0105** |
| **Plaintiffs,** | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| **MARSHFIELD CLINIC HEALTH SYSTEM, INC.,** | : | |
| **Defendant.** | : | |

## CLASS ACTION COMPLAINT

Plaintiffs Lisa Marie Pettis and Holly Mathews (collectively "Plaintiffs") bring this class action lawsuit in their individual capacity and on behalf of all others similarly situated against Marshfield Clinic Health System, Inc. ("Marshfield" or "Defendant") and allege, upon personal knowledge as to their own actions, their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Information about a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences, including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[1]

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), available at https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited Jan. 22, 2026) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Tood Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), available at https://themarkup.org/pixel-

2.      Simply put, if people do not trust that their sensitive Private Information will be kept private, they are less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and ensuring it is kept confidential and not disclosed to anyone other than the person's medical providers is vitally necessary to maintain public trust in the healthcare system as a whole.

3.      Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code which can connect the individual to the collecting entity.

4.      As detailed herein, Marshfield's illegal and widespread practice of disclosing Plaintiffs' and putative Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to herein as "Private Information") to third parties, including, but not necessarily limited to, Google, LLC. ("Google") is an ongoing harm to its users and the healthcare system as a whole.

**Marshfield Collects a Significant Amount of Private Information**

5.      Marshfield, controls and maintains a website, https://www.marshfieldclinic.org/ (the "Website"), which it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes and more.

6.      Plaintiffs and Class Members who visited and used Defendant's Website (collectively, the "Users") understandably thought they were communicating *only* with their trusted healthcare provider.

---

hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Jan. 22, 2026).

7.      Unbeknownst to Plaintiffs and Class Members, however, Defendant embedded various third-party tracking technology including but not limited to Google Analytics and DoubleClick (collectively "Tracking Tools") on its Website, which automatically transmits to third parties every click, keystroke and detail about their medical treatment.

8.      Operating as designed and as implemented by Marshfield, the Tracking Tools allow the Private Information that Plaintiffs and Class Members provide to Marshfield to be unlawfully disclosed to third parties, like Google.

9.      Thus, in the case of information sent by Marshfield to third parties, the sensitive and protected Private Information is linked to Users' unique IP address or other identifiable user profiles created by the Tracking Tools.

10.     Tracking Tools are snippets of code embedded on a website (or other digital platform) that surveil and record a User's identity and activity, such as  how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among other things.

11.     The User's web browser executes the Tracking Tool via instructions within the webpage to communicate certain information based on parameters selected by the website's owner. Tracking Tools are customizable and programmable, meaning that the website owner controls which of its web pages contain the Tracking Tools and which events are tracked and transmitted to third parties.

12.     By installing Tracking Tools, Marshfield effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to unknowingly disclose their private, sensitive, and confidential health-related communications with Marshfield to third parties.

13.     Marshfield utilized Tracking Tools for marketing purposes to bolster its profits; that is, despite its duty to maintain the privacy its Users' PHI, Marshfield put its own desires for profit over its patients' privacy rights.

14.     Tracking Tools are routinely used to target specific customers by utilizing data to build incredibly fulsome and robust profiles for the purposes of retargeting and future marketing. Third parties use Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions and other Private Information disclosed to Defendant.

15.     The information that Defendant's Tracking Tools sent to third parties included the Private Information that Plaintiffs and Class Members submitted to Defendant's Website, including, for example, patient status, medical conditions searched by Users', names of providers whose profile pages were viewed by the Users, when Users click to sign in to the patient portal, click to fill a prescription, click to pay a bill, User's free-text searches made via the search bar and every page URL the User visited on the website.

16.     The information described in the preceding paragraph allows a third party (*e.g.*, Google) to know that a specific patient was seeking confidential medical care. Third parties, in turn, sell Plaintiffs' and Class Members' Private Information to third-party marketers who geo-target Plaintiffs based on communications obtained via the Tracking Technology.

17.     Google and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data sent by Defendant's Tracking Tools that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia or HIV.

**Marshfield's Disclosure of Users' Private Information**
**Without Consent Violates the Law**

18.    Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its web pages to an undisclosed third party without the patients' informed and express consent.

19.    Neither Plaintiffs nor any other Class Member were provided, much less signed, a written authorization permitting Marshfield to disclose their Private Information to third parties.

20.    Despite willfully and intentionally incorporating the Tracking Tools into its Website and servers, Marshfield has never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications and Private Information with third parties.[2]

21.    Marshfield's overall intent and purpose in acquiring Users' personal health data was to increase its ability to market and retarget its Users, thereby increasing its profit while violating HIPAA and federal statutes.

22.    Plaintiffs and Class Members were unaware that their Private Information was being surreptitiously transmitted to third parties as they communicated with their healthcare providers via Marshfield's Website or that their information was stored on Marshfield's servers to be later transmitted to third parties so it could be used for targeted advertising and marketing purposes.

---

[2]    In contrast to Defendant, several medical providers which have installed marketing tracking tools on their websites have provided their patients with notices of data breaches caused by the Pixel transmitting PHI to third parties. *See, e.g., Cerebral, Inc. Notice of HIPAA Privacy Breach*, available at https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited Jan. 22, 2026); *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022), available at https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited Jan. 22, 2026); *Novant Health 1.36 Million Patients About Unauthorized Disclosure of PHI via Meta Pixel Code on Patient Portal* (Aug. 16, 2022), available at https://www.hipaajournal.com/novant-health-notifies-patients-about-unauthorized-disclosure-of-phi-via-meta-pixel-code-on-patient-portal/ (last visited Jan. 22, 2026).

23.     As detailed below, Defendant owed statutory, regulatory, and contractual duties to keep Plaintiffs' and Class Members' communications and medical information safe, secure and confidential.

24.     The disclosure of Plaintiffs' and Class Members' Private Information via the Tracking Tools contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.

25.     Further to the HIPAA Privacy Rule, covered entities such as Marshfield are **not** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent from each patient.

26.     Lest there be any doubt of the illegal nature of Marshfield's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin"), that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[3]

27.     The HHS Bulletin does not change any existing rule or impose any new obligation

---

[3]     *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited January 17, 2026) (emphasis added).

on HIPAA-covered entities. Instead, it reminds these entities of their long-standing obligations by referring to guidance and rules that have been in place for decades. *Id.* ("[I]t has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors").

28.    In contrast to Marshfield, several medical providers that used Tracking Tools in a similar way have provided their patients with notice that their Private Information was transmitted to third parties.[4]

29.    Marshfield, moreover, made express promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

30.    Marshfield breached its statutory, regulatory and contractual obligations to Plaintiffs and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web based technologies to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share Users' Private Information; (iii) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Google and other third parties; (iv) failing to take steps to block the transmission

---

[4]    *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited Jan. 22, 2026); *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited May 6, 2024); *Novant Health notifies 1.36 Million Patients About Unauthorized Disclosure of PHI via Meta Pixel Code on Patient Portal* (Aug. 16, 2022), https://www.hipaajournal.com/novant-health-notifies-patients-about-unauthorized-disclosure-of-phi-via-meta-pixel-code-on-patient-portal/ (last visited Jan. 22, 2026).

of Plaintiffs' and Class Members' Private Information through Tracking Tools; (v) failing to warn Plaintiffs and Class Members of sharing their Private Information with third parties and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality, security and integrity of patient Private Information.

31.    As a result, Plaintiffs and Class Members have suffered numerous injuries, including: (i) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Tracking Tools, (ii) loss of benefit of the bargain, (iii) diminution of value of the Private Information, (iv) statutory damages and (v) the continued and ongoing risk to their Private Information.

32.    Plaintiffs therefore seek on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert statutory claims against Marshfield: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*

## PARTIES

33.    Lisa Marie Pettis is a natural person and a citizen of the State of Wisconsin. Plaintiff has been a patient of Marshfield and a user of *www.marshfieldclinic.org* since at least 2015. Plaintiff has maintained a Google account since at least 2010. During the relevant time period, Plaintiff has used the Marshfield Website to schedule appointments, request information on specific medical services, research providers, pay medical bills, and login to MyChart. By doing so, Plaintiff's individually identifiable health information was disclosed to Google under the systematic process described above. Plaintiff had no knowledge her sensitive medical information was shared with Google or other third parties and gave no consent or authorization for Marshfield to disclose her individually identifiable health information.

34.    Holly Mathews is a natural person and a citizen of the State of Wisconsin. Plaintiff

has been a patient of Marshfield since at least 1999. Plaintiff has been a user of *www.marshfieldclinic.org* since at least 2010. Plaintiff has maintained a Google account since at least 2012. During the relevant time period, Plaintiff has used the Marshfield Website to schedule appointments, request information on specific medical services, research providers, pay medical bills, and login to MyChart. By doing so, Plaintiff's individually identifiable health information was disclosed to Google under the systematic process described herein. Plaintiff had no knowledge her sensitive medical information was shared with Google or other third parties and never consented or authorized Marshfield to disclose her individually identifiable health information

35.     Marshfield is a nonprofit health system with over 60 locations throughout the heart of Wisconsin and the upper peninsula of Michigan. Its system is comprised of hospitals, primary and specialty care, emergency services, surgery, cancer treatment, behavioral and dental care, and telehealth services.

36.     Marshfield is a covered entity under HIPAA.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, specifically the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged form part of the same case or controversy.

38.     This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), which expressly provides federal courts with jurisdiction over any class action in which: the proposed class includes at least 100 members; any member of the class is a citizen of a state and any defendant is a citizen or subject of a foreign state; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

39.     This Court has personal jurisdiction over Marshfield because it operates and maintains its principal place of business in this District. Further, Marshfield is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and management of its Website in this District, including decisions regarding the privacy of Users' Private Information and the incorporation of Tracking Tools.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in, and is subject to, personal jurisdiction in this District. Venue is also proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in, and emanated from, this District.

## COMMON FACTUAL ALLEGATIONS

A.     **Background: The Use of Tracking Technologies in the Healthcare Industry**

41.     Tracking Tools installed on many hospitals', telehealth companies' and other healthcare providers' websites (and other digital properties) are collecting patients' and other visitors' confidential and private health information—including details about their medical conditions, prescriptions and appointments, among many other things—and sending that information to third party vendors without prior, informed consent.

42.     These Tracking Tools are snippets of code that track users as they navigate through a website, logging which pages they visit, which buttons they click and certain information they enter into forms. In exchange for installing the Tracking Tools, the third-party platforms (*e.g.* Google) provide website owners analytics about the advertisements they have placed as well as tools to target people who have visited their websites.

43.     While the information captured and disclosed without permission may vary depending on the Tracking Tools embedded, these "data packets" can be extensive, sending, for example, not just the name of the physician and her field of medicine, but also the first name, last

name, email address, phone number, zip code and city of residence entered into the booking form.

44.    The data set forth in the preceding paragraph is linked to a specific internet protocol ("IP") address. The Google Tracking Tools, for example, send information to Google via unique identifier cookies. These cookies enable Google to create a comprehensive user profile by connecting web activity to an existing Google account or, if the User is not signed in, to a unique user profile.

45.    Even IP addresses—which in theory could be connected to several members of the same household—are considered PHI *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the medical provider collects this information through its website or mobile app, it is indicative that the individual has received or will receive health care services or benefits from the medical provider.[5]

46.    Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to surreptitiously capture and to disclose their Users' personal health information.

47.    Specifically, and for example, The Markup reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel, a similar Tracking Tool, to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment.[6]

---

[5]    *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.

[6]    *See* ash Aryal, *Google Analytics for Healthcare Websites: Harnessing Powerful Insights to Supercharge Your Practice*, Digital Spotlight (October 4, 2024), available at https://www.digitalspotlight.com/google-analytics-healthcare-websites/ (last visited November 12, 2025).

**B.      Marshfield Installed and Utilized Tracking Technology for the Purpose of Disclosing Plaintiffs' and Class Members' Private Information to Google.**

48.      Marshfield purposely installed the Tracking Tools including but not limited to Google's DoubleClick and Google Analytics technologies on its Website and programmed the Website to surreptitiously share its patients' private and protected communications with Google, including communications containing Plaintiffs' and Class Members' Private Information.

49.      On numerous occasions, with the most recent in 2025, Plaintiff Lisa Marie Pettis accessed Marshfield's Website on her mobile device and computer and used the Website to schedule appointments, request information on specific medical services, research providers, pay medical bills, and login to MyChart.

50.      On numerous occasions, with the most recent in 2025, Plaintiff Holly Mathews accessed Marshfield's Website on her mobile device and computer and used the Website to schedule appointments, request information on specific medical services, research providers, pay medical bills, and login to MyChart.

51.      Further to the systematic process described above, Marshfield assisted Google with intercepting Plaintiffs' communications including those containing personally identifiable information, protected health information and related confidential information.

52.      Marshfield assisted these interceptions without Plaintiffs' knowledge, consent or express written authorization. By failing to receive the requisite consent, Marshfield breached confidentiality and unlawfully disclosed Plaintiffs' personally identifiable information and protected health information.

**C.      Google's Tracking Tools Including Google Analytics and DoubleClick**

53.      By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider

(Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google Doubleclick and Google AdWords.

54.     Though lesser known, Google Analytics has massive reach. The Wall Street Journal called it "far and away the web's most dominant analytics platform" and explained that it "tracks you whether or not you are logged in."[7]

55.     Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Cookies are personally identifiable for Google. For example, Google explains the following about certain cookies that it uses:

a.      "SID and HSID cookies contain digitally signed and encrypted records of a user's Google Account ID and most recent sign-in time."[8]

b.      "[M]ost people who use Google services have a cookie called 'NID' or '_Secure-ENID' in their browsers… These cookies are used to remember your preferences and other information, such as your preferred language [and] how many results you prefer to have shown on a search results page."[9]

c.      "Google uses cookies for advertising purposes, including to show personalized ads, serving and rendering ads, and personalizing ads… the 'NID' cookie is used to show

---

[7] Christopher Mims, Who Has More of Your Personal Data than Facebook? Try Google, The Wall Street Journal, April 22, 2018, available at, *https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401* (last accessed Jan. 23, 2026).

[8] Google Privacy & Terms, How Google Uses Cookies, available at,*https://policies.google.com/technologies/cookies* (last accessed Jan. 23, 2026).

[9] *Id.*

Google ads in Google services for signed-out users, while the 'IDE' and 'id' cookies are used to show Google ads on non-Google sites… the 'DSID' cookie is used to identify a signed-in user on non-Google sites so that the user's ads personalization setting is respected accordingly."[10]

56.    Certain cookies set by Google on Marshfield's Website are used in connection with Google's advertising products. Google explains in its published cookie information that it "uses cookies and similar technologies for advertising purposes, including serving and rendering ads, and personalizing ads … [and that] [t]hese cookies also are used for limiting the number of times an ad is shown to a user, muting ads you have chosen to stop seeing, and delivering and measuring the effectiveness of ads." The cookies on Marshfield's Website that fall into this category include __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, all of which are set by Google domains and operate within Google's advertising and ad-measurement ecosystem on third-party websites.[11]

57.    Marshfield deploys Google Analytics tracking on its website.

58.    When a patient sends a communication to Marshfield through its website, the Google Tracking Tools deployed by Marshfield cause the patient's IP address, unique device or browser identifiers (including Google-assigned cookie values), and the full text content of the patient's communication (e.g., "treating brain cancer") to be transmitted to Google as part of the tracking requests fired on that webpage.

59.    Marshfield deploys Google Doubleclick tracking on its website.

---

[10] *Id.*

[11] Google, *How Google Uses Cookies*, https://policies.google.com/technologies/cookies?hl=en-US (last visited Jan. 23, 2026).

60.     Google Doubleclick is a third-party advertising service that tracks users across the Internet using personally identifiable data and communications to place targeted advertisements.

61.     Marshfield uses patient means of identification including cookies to help Google Doubleclick acquire and record patients' data and the content of their communications without the patients' knowledge, action, authorization, or consent.

62.     The cookies and identifiers used by Marshfield's website that enable Google DoubleClick and Google Ads to acquire and record patient communications and patient-identifying information include, as discussed above, cookies named IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, each of which functions as a persistent personal identifier when received by Google and is used by Google's advertising and analytics systems to associate user activity—including the patient communications transmitted by Marshfield—with Google's existing user and device profiles.

63.     Marshfield installed Google's Tracking Tools, including upon information and good faith belief, Google Analytics and DoubleClick, as well as other tracking technologies, on many (if not all) of the webpages within its Website and programmed or permitted those webpages to surreptitiously share patients' private and protected communications with Google—communications that included Plaintiffs' and Class Members' Private Information.

64.     Plaintiffs' and Class Members' Private Information would not have been disclosed to Google via the Google Tracking Tools but for Marshfield's decision to install and implement those tools.

65.     By installing and implementing Google Tracking Tools, Marshfield caused Plaintiffs' and Class Members' communications to be intercepted and transmitted to Google via the Tracking Tools.

66.     While Marshfield patients navigate Marshfield's Website, the Website routinely provides Google with its IP addresses and/or device IDs and the other information they input into Marshfield's Website, including not only their medical searches, names of providers whose profile pages were viewed by the patient, appointment requests, when patients click to sign in on the patient portal, click to pay a bill, any free-text searches made by patients, every page a patient visited but, upon information and good faith belief, also their name, email address and/or phone number.

67.     This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of patients.[12] Plaintiffs' and Class Members identities can be easily determined based on IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

68.     Google Analytics and Google advertising technologies do not operate anonymously. Google expressly confirms that cookies may be used in conjunction with advertising technologies and that server logs include identifiers that distinguish and, when a user is signed-in, may uniquely identify a user. Google states that in the context of advertising "we store a record of the ads we serve in our logs," and that those logs "typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[13]

---

[12] *See*                        https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jan. 23, 2026).

[13] Google, Advertising & Measurement Technologies,
*https://policies.google.com/technologies/ads* (last visited Jan. 14, 2026).

69.     Google's tracking ecosystem uses cookies that are personally identifying to Google. Google explains that "cookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google Account ID and most recent sign-in time.[14]

70.     Google also uses advertising cookies to target and deliver ads, including across non-Google sites. Google states: "The 'IDE' and 'id' cookies are used to show Google ads on non-Google sites," and that "The 'NID' cookie can be used to show ads in Google services for signed-out users." In addition, Google explains that "the 'DSID' cookie is used to identify a signed-in user on non-Google sites," confirming that Google can recognize a logged-in user even while that user browses a third-party website.[15]

71.     The Private Information disclosed via the Tracking Tools allow Google to know that a specific patient is seeking confidential medical care and the type of medical care being sought. Google then uses that information to sell advertising to Marshfield and other advertisers and/or sells that information to marketers who use it to online target Plaintiffs and Class Members.

72.     The third parties that receive information from the Google Tracking Tools and/or user data and communications for their own marketing purposes and for the marketing purposes of the website owner. Ultimately, the purpose of collecting user data is to make money.

73.     Thus, without any knowledge, authorization or action by a user, website owners like Marshfield use embedded tracking code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties, including but not limited to Google.

---

[14] Google, How Google Uses Cookies & Similar Technologies,
https://policies.google.com/technologies/cookies?hl=en-US (last visited Jan. 14, 2026).

[15] *Id.*

74. In this case, Marshfield employed the Tracking Tools described above to intercept, duplicate and re-direct Plaintiffs' and Class Members' Private Information to third parties.

75. In sum, the Tracking Tools on the Website transmitted Plaintiffs' and Class Members' highly sensitive communications and Private Information to third parties, which communications contained private and confidential medical information.

76. The transmissions described in the preceding paragraph were performed without Plaintiffs' or Class Members' knowledge, consent or express written authorization.

77. As explained below, these unlawful transmissions are initiated by Marshfield's source code concurrent with communications made via the Website.

**D.    Defendant's Method of Transmitting Plaintiffs' and Class Members' Private Information via the Tracking Tools (*i.e.,* the interplay between HTTP Requests and Responses, and Tracking Code)**

78. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser and Microsoft's Edge browser).

79. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

80. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

  **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[16]

81.    A patient's HTTP Request essentially asks Marshfield's Website to retrieve certain information (such as a physician's "Request an Appointment" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate the Website).

82.    Every website consists of Markup and "Client-Side Code."

83.    Client-Side Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

84.    Client-Side Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

85.    Defendant's Tracking Tools consist of embedded third-party JavaScript that does just that. A Tracking Tool acts much like a traditional wiretap by surreptitiously transmitting a

---

[16]    One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

Website User's communications and inputs to third parties.

86.    When patients visit Defendant's Website via an HTTP Request to Marshfield's server, Marshfield's server sends an HTTP Response (including the Markup) that displays the webpage visible to the user, along with Client-Side Code (including Marshfield's Tracking Tools).

87.    Thus, Marshfield is, in essence, handing patients a tapped device and once the webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the webpage to trigger the Tracking Tools, which intercept those communications—intended only for Marshfield—and transmits those communications to third-parties, including but not limited to Google.

88.    Third parties, like Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the patient associated with the Personal Information intercepted (in this case, highly sensitive Private Information).

89.    The third parties to whom a website transmits data through Tracking Tools and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.*, to bolster profits).

90.    Thus, without any knowledge, authorization, or action by a user, a website owner like Marshfield can use its Tracking Tools to commandeer the user's computing device, causing the device to contemporaneously and invisibly redirect the Users' communications to third parties.

91.    In this case, Marshfield employed the Tracking Tools to intercept, duplicate and re-direct Plaintiffs' and Class Members' Private Information to third parties including but not limited to Google.

92.    For anyone who visits Marshfield's Website is presented with a search bar and seven buttons that provide the following options: "Home," "Find a Doctor," "Locations," "Appointments," "Specialties & Services," "Patient Resources," and "Careers." Clicking "Find a Doctor" button presents patients with a list of relevant doctors. Following that, patients can click to view a doctor's profile, which includes information about that doctor and patient reviews. From that page, patients can click to call for an appointment, or fill out an online form to request an appointment.

93.    For example, as shown in Figure 1 below, if a patient clicks "Find a doctor," and searched for 'cancer' they will receive a list of doctors. Then, they can click to call for an appointment or submit an online request for an appointment form. The request for an appointment form instructs and requires patients to fill in text boxes with Personal Information. At every stage, Tracking Tools implemented in the Defendant's Source Code automatically tracks and transmits the user's communications, contemporaneously and without the users' knowledge.



***Figure 1. Search results for "cancer" in Find a Doctor search bar***

94.     Figure 2 depicts the tracking activity that occurs when a user searches for "cancer" using the "Find a Doctor" feature shown in Figure 1. At that time, Tracking Tools embedded in Defendant's source code record and transmit information reflecting the user's search term and interaction with the search function, along with associated unique identifiers, to Google for analytics and advertising purposes.



***Figure 2. Tracker contemporaneously transmits contents of Find a Doctor search to Google.***

95.     Figure 3 shows the user-facing webpage that appears after a user selects a physician from the search results, displaying the physician's profile and options to contact the provider or request an appointment.



*Figure 3. User view after clicking on Dr. Abdelhadi from Find a Doctor Search results.*

96.     Figure 4 depicts the tracking activity that occurs when the physician profile shown in Figure 3 loads. At that time, Tracking Tools embedded in Defendant's source code automatically transmit information about the specific page viewed and the user's interaction and selection, along with unique identifiers, to Google for analytics and advertising purposes.



*Figure 4. Tracker contemporaneously transmits user's action—Clicking on Dr.Abdelhadi—to Google.*

97.     Figure 5 shows the user-facing webpage that appears when a user proceeds from the physician profile to request an appointment. The page prompts the user to begin scheduling care by submitting an online appointment request.



*Figure 5. Request an appointment form directs patients to enter personal information into text boxes and click "Request Appointment."*

98.     Figure 6 depicts the tracking activity that occurs when a user submits or confirms an appointment request on the page shown in Figure 5. At that time, Tracking Tools embedded in Defendant's source code transmit information confirming that the user scheduled an appointment with the selected physician, together with the users' unique identifiers, to Google for analytics and advertising purposes.



*Figure 6. Tracker contemporaneously transmits the user's request to Google.*

99.    Marshfield's Tracker intercepts and discloses to Google and other third parties both the "contents" of individuals' communications on the Marshfield Website (*i.e.,* the URLs, buttons, links, pages, and tabs they view and the information entered into the Website's forms) and identifiers that can uniquely identify the patient (*i.e.,* the individuals' IP addresses, cookie identifiers, device identifiers and account numbers).

100.    Once a patient chooses a doctor, all of the information that patient has submitted is automatically sent directly to third parties, including but not limited to Google. The information transmitted to third parties includes, (i) the fact that the patient clicked on a specific provider's profile page (ii) the patient's search parameters and (iii) any information the patient typed into

their request an appointment form.

101.    If the User schedules an appointment, Defendant communicates every step of the process to third parties.

102.    For example, if a patient enters their name, phone number, and zip code in the form shown in Figure 5 above and clicks "Submit," Defendant shares this action with third parties — along with the provider's name and patient's search parameters (which were also already shared in previous interactions).

103.    If a User searches for treatment or a particular condition on Marshfield's Website, such as "breast cancer" or "infectious disease," the Tracking Tools send that information to third parties as well.

104.    Each time Marshfield sends this activity data, it also discloses a patient's personally identifiable information alongside the contents of their communications.

105.    Thus, Marshfield reveals to Google and other third parties the exact links and pages website users click and view and discloses extensive insight into the user's past, present, and/or future health care, which undoubtably qualifies as protected health information under HIPAA. *See* 18 U.S.C. § 2510.

106.    This example highlights just one of the hundreds (if not thousands) of paths on Marshfield's Website demonstrating how Defendant's Website surreptitiously collect and transmit protected health information to its third-party vendors.

107.    The disclosures described above are taking place without Users' consent.

108.    Thus, without the consent of visitors to its Website, Defendant has effectively used its source code to commandeer Users' computing devices thereby re-directing their Private Information to third parties.

109. The information Defendant's Tracking Tools send to Google and other third parties may include, among other things, users' PII, PHI and other confidential information.

110. Consequently, when Plaintiffs and Class Members visit Marshfield's website and communicate their Private Information, it is transmitted to third parties, including, but not limited to, appointment type and date, physician selected, specific button/menu selections, content typed into free text boxes, demographic information, email addresses, phone numbers and emergency contact information.

**E.    Marshfield's Tracking Tools Caused Plaintiffs' and Class Members' PII and PHI to be Sent to Third Parties.**

111. Marshfield utilizes and intentionally installed the Tracking Tools on its Website to secretly track patients by recording their activity and experiences in violation of its contractual, statutory and regulatory duties and obligations.

112. Marshfield's Website contains multiple unique identifiers associated with the Google Tracking Tools (including Google Analytics and DoubleClick), which indicate that the Tracking Tools are being used on a particular webpage.

113. Together, the Google Tracking Tools enable Marshfield to optimize the delivery of ads, measure cross-device conversions, create custom audiences and reduce advertising and marketing costs.

114. However, Marshfield's Website does not rely on Tracking Tools in order to function.

115. While seeking and using Marshfield's services as a medical provider, Plaintiffs and Class Members communicated their Private Information to Marshfield via its Website.

116. Marshfield did not disclose to Plaintiffs and Class Members that their Private Information would be shared with third parties as it was communicated to Defendant.

117.    Plaintiffs and Class Members never consented, agreed, authorized or otherwise permitted Marshfield to disclose their Private Information to third parties including but not limited to Google, nor did they intend for third parties to be a party to their communications with Defendant.

118.    Marshfield's Tracking Tools sent non-public Private Information to third parties, including but not limited to Plaintiffs' and Class Members': (i) status as medical patients; (ii) health conditions; (iii) sought treatment or therapies; (iv) appointment requests and appointment booking information; (v) locations or facilities where treatment is sought; (vi) which web pages were viewed and (vii) phrases and search queries conducted via the general search bar.

119.    Importantly, the Private Information Defendant's Tracking Tools was sent alongside unique identifiers assigned to Plaintiffs' and Class Members' devices or browsers, including IP addresses and Google cookies such as IDE, NID, _Secure-ENID, DSID, and SID, thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique identity.[17]

120.    Marshfield deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented technology (*i.e.*, the Tracking Tools) that surreptitiously tracked, recorded and disclosed Plaintiffs' and other online patients' confidential communications and Private Information; (ii) disclosed patients' protected information to Google—an unauthorized third party—and (iii) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

121.    Plaintiffs never consented, agreed, authorized or otherwise permitted Defendant to

---

[17]    Defendant's Website tracks and transmits data via first-party and third-party cookies, including cookies associated with Google Analytics, Google Ads, and Google DoubleClick.

disclose their PII and PHI nor did they authorize any assistance with intercepting their communications.

122.    Plaintiffs were never provided with written notice that Marshfield disclosed its Website Users' PHI or provided any means of opting out of such disclosures.

123.    Despite this, Marshfield knowingly and intentionally disclosed Plaintiffs' PHI to third parties including but not limited to Google.

124.    By law, Plaintiffs are entitled to privacy in their protected health information and confidential communications.

125.    Marshfield deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded and disclosed Plaintiffs' and Class Members' confidential communications, personally identifiable information and protected health information to a third party and (ii) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.

## I.    Defendant's Privacy Policy and Promises

126.    During the time period relevant to the Complaint, Marshfield's Notice of Privacy Practices provided that:

> We have long been committed to protecting patient privacy. As part of this commitment, we follow federal and state law which requires us to maintain the privacy of your health information and to provide you with this Notice of our privacy practices.
>
> * * *
>
> For any purpose other than the ones described below, we may use or disclose your health information only when you give us your written authorization to do so.[18]

127.    Defendant represents to patients and visitors to its Website that it will keep PHI

---

[18] Marshfield Clinic Health System, Privacy Policy, *https://www.marshfieldclinic.org/about-us/privacy-policy* (last visited Nov. 22, 2025).

confidential and that it will only use and disclose its patients' PHI without written authorization under certain circumstances, ***none of which apply here***.[19]

128.    Defendant's Notice does not permit it to use and to disclose Plaintiffs' and Class Members' Private Information for marketing purposes without prior express consent:

> We must obtain your written authorization before using your health information to send any marketing materials to you. We can provide you with marketing materials in a face-to-face encounter, or a promotional gift of very small value, if we so choose. We may communicate with you about products or services relating to your treatment, to coordinate or manage your care, or provide you with information about different treatments, providers or care settings.[20]

129.    Defendant violated its own Privacy Notice by unlawfully intercepting and disclosing Plaintiffs' and Class Members' Private Information to third parties without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific patients' consent or authorization to share the Private Information.

**J.    Federal Warning on Tracking Codes on Healthcare Websites**

130.    Beyond Defendant's own policies, the federal government has issued guidance warning that tracking code like the Tracking Tools employed by the Defendant may come up against federal privacy law when installed on healthcare websites.

131.    The OCR Bulletin is clear that healthcare organizations regulated under HIPAA may use third-party tracking tools, such as the Defendant's Tracking Tools, in a limited way, to

---

[19] *Id.* (describing circumstances when Marshfield will use or disclose patient PHI without written authorization, including treatment, payment, health care operations, shared medical record/health information exchange, disclosures to business associates, disclosures to relatives, close friends and other caregivers, contacting patients, facility/patient directory, fundraising communications, public health activities, victims of abuse, neglect or domestic violence, health oversight activities, judicial and administrative proceedings, law enforcement officials, coroners, medical examiners, and funeral directors, organ and tissue donation, research, health or safety, specialized government functions, inmates, workers' compensation, and to comply with the law.)

[20] *Id.*

perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' protected health information to these vendors. [21]

132. The Bulletin explains:

Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. *For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.*[22]

133. The Bulletin discusses the types of harm that disclosure may cause to the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, *discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.* Such disclosures can reveal incredibly sensitive information about an individual, *including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.* While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*[23]

134. Plaintiffs and Class Members face just the risks about which the government expresses concern. Defendant has passed along Plaintiffs' and Class Members' search terms about health conditions for which they seek doctors; their contacting of doctors to make appointments; the names of their doctors; the frequency with which they take steps relating to obtaining

---

[21]    *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.

[22]    *Id.* (emphasis added).

[23]    *Id.* (emphasis added).

healthcare for certain conditions and where they seek medical treatment.

135.    This information is, as described by the OCR Bulletin, "highly sensitive." The

Bulletin goes on to make clear how broad the government's view of protected information is as it

explains:

> This information might include an individual's medical record
> number, home or email address, or dates of appointments, as well as
> an individual's IP address or geographic location, device IDs, *or any
> unique identifying code.*[24]

136.    Crucially, that paragraph in the government's Bulletin continues:

> IIHI [individually identifiable health information] collected on a
> regulated entity's website or mobile app generally is PHI, even if
> the individual does not have an existing relationship with the
> regulated entity and even if the IIHI, such as in some circumstances
> IP address or geographic location, does not include specific
> treatment or billing information like dates and types of health care
> services… [for example,] if an individual were looking at a
> hospital's webpage listing its oncology services to seek a second
> opinion on treatment options for their brain tumor, *the collection
> and transmission of the individual's IP address, geographic
> location, or other identifying information showing their visit to
> that webpage is a disclosure of PHI to the extent that the
> information is both identifiable and related to the individual's
> health or future health care.*[25]

137.    The OCR Bulletin reminds healthcare organizations regulated under the HIPAA

that they may use third-party tracking tools, such as the Google Tracking Tools, only in a limited

way, to perform analysis on data key to operations. They are not permitted, however, to use these

tools in a way that may expose patients' PHI to these vendors.[26]

---

[24]    *Id.* (emphasis added).

[25]    *Id.* (emphasis added).

[26]    *See id.*

138. The federal government is taking these violations of health data privacy and security seriously as recent high-profile FTC settlements against several telehealth companies evidence.

139. For example, in 2021 and 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook and Google. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[27]

140. Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result

---

[27] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising, Fed. Trade Comm'n* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, Fed. Trade Comm'n (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, Fed. Trade Comm'n (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc; *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, Fed. Trade Comm'n (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google.); (last visited January 17, 2026).

in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[28]

141.    This is further evidence that the data that Defendant chose to disclose is protected Private Information, and the disclosure of that information was a violation of Plaintiffs' and Class Members' rights.

**K.    Marshfield's Use of Tracking Technologies Violated HIPAA.**

142.    Marshfield's disclosure of Plaintiffs' and Class Members' Private Information to entities like Google also violated HIPAA.

143.    Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[29]

144.    Guidance from HHS instructs healthcare providers that patient status alone is protected by HIPAA.

145.    HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual"

---

[28] *See Use of Online Tracking Technologies by HIPAA*, *supra* note 3.

[29] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

146.    The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

147.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

> A.    Names;
> …
> H.    Medical record numbers;
> …
> J.    Account numbers;
> …
> M.    Device identifiers and serial numbers;
> N.    Web Universal Resource Locators (URLs);
> O.    Internet Protocol (IP) address numbers; … and
> P.    Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[30]

---

[30] *See* 45 C.F.R. § 160.514.

148.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

149.    Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, is considered PHI.

150.    HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[31]

151.    Consistent with this restriction, HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[32]

152.    Here, as described *supra*, Marshfield provided patient information to third parties in violation of the Privacy Rule—and its own Privacy Policy. An individual or corporation violates

---

[31] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,* U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited January 17, 2026).

[32] *Marketing,* U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited January 17, 2026).

the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320(d)(6).

153.    The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization."  42 U.S.C. § 1320(d)(6).

154.    Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

155.    HIPAA also requires Marshfield to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1)—which Marshfield failed to do.

156.    Under HIPAA, Marshfield may not disclose PII about a patient, potential patient or household member of a patient for marketing purposes without the patient's express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

157. Marshfield further failed to comply with other HIPAA safeguard regulations as follows:

a) Failing to ensure the confidentiality and integrity of electronic PHI that Marshfield created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b) Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c) Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Marshfield in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d) Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e) Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3), and

f) Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

158. In disclosing the content of Plaintiffs and the Class Members' communications, Marshfield had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions.

159. Marshfield's placing third-party Tracking Tools on its Website is a violation of Plaintiffs' and Class Members' privacy rights under federal law. While Plaintiffs do not bring a claim under HIPAA itself, this violation demonstrates Marshfield's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

**L.      Plaintiffs' and Class Members' Private Information Has Substantial Financial Value.**

160.     Plaintiffs and Class Members' Private Information has value, and Marshfield's disclosure and interception harmed Plaintiffs and the Class by not compensating them for the value of their Private Information and in turn diminishing the value of their Private Information.

161.     The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the technology economy.

162.     Courts recognize the value of personal information and the harm when it is disclosed without consent. *See, e.g., In re Lurie Children's Hosp. Data Sec. Litig.*, No. 24-CV-05503, 2025 WL 2754760, at *1 (N.D. Ill. Sept. 27, 2025) (recognizing that disclosure of private medical information, including diagnoses and treatment information, constitutes a concrete and cognizable harm); *Smith v. Loyola Univ. Med. Ctr.*, No. 23-CV-15828, 2024 WL 3338941, at *6–*7 (N.D. Ill. July 9, 2024) (holding that plaintiffs plausibly alleged injury based on the unauthorized disclosure of sensitive health-related information through tracking pixels and recognizing disclosure of private medical information as a traditionally cognizable harm).

163.     Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

164.     Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, the damage caused can be irreparable.

165.     The value of health data is well-known and various reports have been conducted to identify its value.

166.    Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[33]

167.    Trustwave Global Security published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[34]

168.    The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[35]

169.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[36]

[33] See *Valuing Healthcare Data* (white paper), Health Capital (Dec. 2017), https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20 Healthcare%20Data.pdf (last visited January 17, 2026).

[34] See *Healthcare Data: The New Prize for Hackers*, Imprivata (Nov. 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited January 17, 2026).

[35] See Alice Park & Brian Everstine, *How the Medical-Data Industry Sells Your Records — and Why Doctors Can't Stop It*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/ (last visited January 17, 2026).

[36] See Lauren Hirsch, *Hospital Execs Say They're Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html ( (last visited January 17, 2026).

170.    The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold evidences the value of PHI.

171.    These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

172.    Google's and others' practices of using such information to package groups of people as "Lookalike Audiences"[37] and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data. Data harvesting is the fastest growing industry in the nation.

173.    As software, data mining and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

174.    Consumer data is so valuable that some have proclaimed that data is the new oil.

175.    Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google.

176.    Overall, the value internet companies derive from Americans' personal data increased almost 54% and is only expected to continue growing in the coming years.

177.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user. By 2020, that value had jumped to approximately $420 per adult American user each year, making personal data sales a nearly $140 million industry.[38]

---

[37] *Lookalike audiences*, Display & Video 360
Help, https://support.google.com/displayvideo/answer/15612398?hl=en (last visited Jan. 17, 2026) ("Lookalike audiences are groups of people that share characteristics with others on an existing 'seed' list … find other potential customers with similar characteristics").

[38]    Pawtocol, *How    Much    Is    User    Data    Worth?*, Medium (Mar.    16, 2020), https://pawtocol.medium.com/how-much-is-user-data-worth-f2b1b0432136 (last    visited Jan. 17, 2026).

178.    In 2025, the global big data market was projected to be valued at approximately

$224.46 billion.[39]

179.    As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage industry, health data is one of the most sought-after commodities. De-identified data can be re identified (citing https://www.nature.com/articles/s41467-019-10933-3/ ) and brazen decisions to release records with identifiable information (citing https://www.wsj.com/articles/hospitals-give-tech-giants-access-todetailed-medical-records-11579516200?mod=hp_lista_pos3 ) are becoming commonplace.[40]

180.    Further demonstrating the financial value of Class Members' medical data, CNBC

has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."
>
> * * *
>
> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other

---

[39] Market Data Forecast, *Big Data Market Size, Share, Trends & Analysis, 2033* (Sept. 25, 2025), https://www.marketdataforecast.com/market-reports/big-data-market (last visited Jan. 24, 2026) (projecting the global big data market to grow from a 2024 value of USD 199.63 billion to an estimated USD 224.46 billion in 2025).

[40] *See* Iris Kulbatski, *The Dangers of Electronic Health Records*, National Post (Feb. 26, 2020), https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-electronic-health-records (last visited January 17, 2026).

data to identify individuals at higher risk of diseases and then raise
their health premiums, or to target advertising to individuals.[41]

181.    The CNBC article also explained:

De-identified patient data has become its own small economy:
There's a whole market of brokers who compile the data from
providers and other health-care organizations and sell it to buyers.
Just one company alone, IQVIA, said on its website that it has access
to more than 600 million patient records globally that are
nonidentified, much of which it accesses through provider
organizations. The buyers, which include pharma marketers, will
often use it for things like clinical trial recruiting But hospital execs
worry that this data may be used in unintended ways, and not always
in the patient's best interest.

* * *

182.    Tech companies are also under particular scrutiny because they already have access

to a massive trove of information about people, which they use to serve their own needs. For

instance, the health data Google collects could eventually help it micro-target advertisements to

people with particular health conditions. Policymakers are proactively calling for a revision and

potential upgrade of the health privacy rules known as HIPAA, out of concern for what might

happen as tech companies continue to march into the medical sector.[42]

183.    Time Magazine similarly, in an article titled, *How your Medical Data Fuels A*

*Hidden Multi-Billion Dollar Industry*, referenced the "growth of the big health data bazaar," in

which patients' health information is sold. It reported that:

[T]he secondary market in information unrelated to a patient's direct treatment
poses growing risks, privacy experts say. That's because clues in anonymized

---

[41]    *See* Lauren Hirsch, *Hospital Execs Say They're Getting Flooded with Requests for Your
Health Data*, CNBC (Dec.  18,  2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-
theyre-flooded-with-requests-for-your-health-data.html (last visited January 17, 2026).

[42]    *Id.*

patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[43]

184.    This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[44]

185.    There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

186.    In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

187.    Marshfield gave away Plaintiffs' and Class Members' communications and transactions on its Website without permission.

188.    The unauthorized access to Plaintiffs' and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiffs and Class Members.

189.    Plaintiffs have a continuing interest in ensuring that their future communications with Marshfield are protected and safeguarded from future unauthorized disclosure.

---

[43]    *See* Alice Park & Brian Everstine, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/ (last visited Jan. 17, 2026).

[44] *See 10 Apps for Selling Your Data for Cash,* WalletHacks, https://wallethacks.com/apps-for-selling-your-data/ (last visited Jan. 17, 2026).

**M.    Defendant Violated Industry Standards.**

190.    A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

191.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

192.    AMA Code of Ethics Opinion 3.1.1 provides that "[p]rotecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

193.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

194.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[45]

---

[45] Am. Med. Ass'n, *Code of Medical Ethics ch. 3*, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited Jan. 17, 2026).

N.    **Users' Reasonable Expectation of Privacy**

195.    Plaintiffs and Class Members were aware of Marshfield's duty of confidentiality when they sought medical services from Marshfield.

196.    Indeed, when Plaintiffs and Class Members provided their PII/PHI to Marshfield, they each had a reasonable expectation that the information would remain private, and that Marshfield would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

197.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

198.    For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[46]

199.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

200.    Plaintiffs' and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Marshfield's status as a healthcare provider, Marshfield's obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of

---

[46] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds,* Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Jan. 17, 2026).

communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Marshfield's express promises of confidentiality.

## O.    Unique Personal Identifiers, including IP Addresses, are Protected Health Information.

201.    While not all health data is covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers and healthcare data clearinghouses.[47]

202.    The HIPAA privacy rule sets forth policies to protect all individually identifiable health information that is held or transmitted, and there are approximately 18 HIPAA Identifiers that are considered PII. This information can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.

203.    These HIPAA Identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses.[48]

204.    Marshfield unlawfully disclosed Plaintiffs' and Class Members' HIPAA identifiers, including their names, emails, dates they sought treatments, computer IP addresses, device identifiers and web URLs visited to third parties through their use of the Tracking Tools *in addition to* services selected, patient statuses, medical conditions, treatments, provider information

---

[47] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook*, The Markup (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations") (last visited January 17, 2026).

[48] U.S. Dep't of Health & Hum. Servs., *Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jan. 17, 2026).

and appointment information.

205.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

206.    In addition to patient status, medical conditions, treatment, specific providers, and appointment information, Marshfield improperly disclosed patients' computer IP addresses to third parties like Google through the use of Tracking Tools.

207.    An IP address is a number that identifies the address of a device connected to the Internet.

208.    IP addresses are used to identify and route communications on the Internet.

209.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

210.    Under HIPAA, an IP address is considered personally identifiable information.

211.    HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

212.    Consequently, Marshfield's disclosure of patients' IP addresses violated HIPAA and industry-wide privacy standards.

213.    In addition to the substantive health-related information described above, Marshfield disclosed to Google and other third parties a series of *unique identifying codes* associated with Plaintiffs' and Class Members' website interactions, including persistent cookie identifiers, device identifiers, and other tracking IDs assigned by Google's tracking

technologies.

214. These unique identifying codes include, among others, Google advertising and analytics cookies such as IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, which function as persistent identifiers that allow Google to distinguish, recognize, and track a specific individual or device across browsing sessions and across websites.

215. Under HIPAA, "individually identifiable health information" expressly includes not only traditional identifiers like names or medical record numbers, but also "any other unique identifying number, characteristic, or code" that can be used to identify an individual or for which there is a reasonable basis to believe the information can be used to identify the individual. 45 C.F.R. § 160.103; 45 C.F.R. § 164.514(b)(2)(i).

216. HIPAA's de-identification rule makes clear that information is *not* de-identified if it includes device identifiers, IP addresses, URLs, or other unique identifying codes, or if the covered entity has actual knowledge that the information could be used—alone or in combination with other information—to identify an individual. 45 C.F.R. § 164.514(b)(2).

217. Marshfield knowingly disclosed these unique identifying codes alongside URLs, page content, search terms, and other communications that directly reflect an individual's interest in, pursuit of, or receipt of healthcare services, thereby allowing third parties to link those health-related communications to a specific, identifiable patient.

218. Because these unique identifying codes were transmitted together with information relating to an individual's health conditions, providers, appointments, or treatment inquiries, they constitute individually identifiable health information—and therefore protected health information—under HIPAA.

219. Marshfield's disclosure of these unique identifying codes to third parties was not

50

incidental, anonymous, or de-identified, but instead enabled ongoing recognition, profiling, and re-identification of Plaintiffs and Class Members in connection with their healthcare activities, in direct contravention of HIPAA's privacy and de-identification requirements.

**P. Defendant was Enriched and Benefitted from the Use of Tracking Tools and Unauthorized Disclosures.**

220. The sole purpose of the use of the Tracking Tools on Marshfield's Website was marketing and profits.

221. In exchange for disclosing the Personal Information of its patients, Marshfield is compensated by Google in the form of enhanced advertising services and more cost-efficient marketing on Google.

222. After receiving individually identifiable patient health information communicated on Marshfield's Website, Google forwards this data, and its analysis of this data, to Marshfield.

223. Marshfield then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Website.

224. Marshfield also receives an additional commercial benefit from using Google's Tracking Tools, such as the Google Analytics and DoubleClick namely being able to serve more targeted advertisements to existing and prospective patients on their Google accounts.

225. Google advertises its Tracking Tools as follows: "when you visit a website that uses [our] advertising services... your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may use the IP address, for example, to identify your general location, to measure the effectiveness of ads, and, depending

on your settings, to improve the relevance of the ads you see. We may also set cookies on your browser or read cookies that are already there."[49]

226.    Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. In particular, retargeting operates through code and tracking technology placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[50]

227.    The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Google via the tracking technologies and the tag embedded on, in this case, Marshfield's Website. For example, when a User searches for doctors or medical conditions or treatment on Marshfield's Website, that information is sent to Google Ads via the conversion tracking tag and associated cookies. Google can then use its data on the User to find more users to click on a Marshfield ad and ensure that those users targeted are more likely to convert.[51]

228.    Through this process, the Google Tracking Tools embedded on Marshfield's Website record and transmit information about a user's activity when the user loads and interacts with the Website. As Google explains, when a user completes or triggers a defined action on a

---

[49] *How Google uses information from sites or apps that use our services*, Privacy & Terms, *https://policies.google.com/technologies/partner-sites* (last visited Jan. 23, 2026).

[50] The Complex World of Healthcare Retargeting, Medico Digital (July 10, 2023), https://www.medicodigital.com/insights/the-complicated-world-of-healthcare-retargeting/ (last visited Jan. 17, 2026).

[51] *See,* WordStream, *How Does Google Remarketing Work?* (explaining that placing Google remarketing code or tag on a website allows advertisers to add visitors to remarketing audiences via browser cookies and then serve targeted Google Ads to those visitors as they browse other sites to increase conversions), https://www.wordstream.com/google-remarketing (last visited Jan. 24, 2026).

website, the Google tag or conversion tracking code reads existing cookies and sends information about the page visited and the action taken back to Google for advertising and measurement purposes. The data transmitted includes the URLs of pages visited and the specific actions taken on the website, which, in the healthcare context, may reflect an individual's interest in or pursuit of medical services.[52]

229.    Plaintiffs' and Class Members' Private Information have considerable value as highly monetizable data especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

230.    In exchange for disclosing the Private Information of their account holders and patients, Marshfield is compensated by Google in the form of enhanced advertising services and more cost-efficient marketing on their platform(s).

**REPRESENTATIVE PLAINTIFF LISA MARIE PETTIS' EXPERIENCES**

231.    As a condition of receiving Marshfield's services, Plaintiff Lisa Marie Pettis disclosed Private Information to Marshfield on numerous occasions, and most recently in 2025.

232.    Plaintiff accessed Marshfield's Website on her phone and laptop to receive healthcare services from Marshfield and at Marshfield's direction.

233.    During the relevant time period, when the Defendant's Tracking Tools were present, Plaintiff used Marshfield's website, https://www.marshfieldclinic.org/, to schedule appointments, request information on specific medical services, research providers, pay medical bills, and login to MyChart. The full scope of Marshfield's interceptions and disclosures of Plaintiff's communications to third parties including but not limited to Google can only be determined through formal discovery. However, Marshfield intercepted at least the following

---

[52] *Id.*

communications about Plaintiff's prospective healthcare. The following long-URLs or substantially similar URLs were sent to third parties via Tracking Tools:

- https://www.marshfieldclinic.org/doctors
- https://www.marshfieldclinic.org/Doctors/Dean-A-Delmastro-MD?ek=Dean%20A%20Delmastro%20MD
- https://www.google-analytics.com/g/collect?v=2&tid=G-2KDC9B8369&gtm=45je61e1v886335340z877439705za20gzb77439705zd77439705&_p=1768691794724&gcd=13l3l3l3l1l1&npa=0&dma=0&cid=235798146.1762537195&ul=en-us&are=1&frm=0&pscdl=noapi&_prs=gs.rd&_eu=AAAAAAQ&_geo=1&_rdi=1&_s=3&tag_exp=103116026~103200004~104527907~104528501~104573694~104684208~104684211~105391253~115616986~115938465~115938468~116988315~117041588&dl=https%3A%2F%2Fwww.marshfieldclinic.org%2Fdoctors%2Fdean-a-delmastro-md%3Fek%3Ddean%2520a%2520delmastro%2520md&sid=1768691716&sct=7&seg=1&dr=https%3A%2F%2Fwww.marshfieldclinic.org%2Fdoctors&dt=Dean%20A%20Delmastro%20MD&en=telephone_link&_c=1&ep.click_text=1-715-858-6767&ep.click_url=tel%3A1(715)858-6767&_et=2304&tfd=50594
- https://www.marshfieldclinic.org/Doctors/Michael-Fallon-MD?ek=Michael%20Fallon%20MD
- https://www.marshfieldclinic.org/Doctors/Anderson-Bauer-MD?ek=Anderson%20A%20Bauer%20MD
- https://www.marshfieldclinic.org/Doctors/Rohit-Sharma-MD?ek=Rohit%20Sharma%20MD%20FACS
- https://www.marshfieldclinic.org/Doctors/Adam-D-Atkins-MD?ek=Adam%20D%20Atkins%20MD
- https://www.marshfieldclinic.org/Doctors/Elmer-G-Lehman-MD?ek=Elmer%20G%20Lehman%20MD
- https://www.google-analytics.com/g/collect?v=2&tid=G-MZ8GZXHC4S&gtm=45je61e1v887275271z877439705za20gzb77439705zd77439705&_p=1768692030282&gcd=13l3l3l3l1l1&npa=0&dma=0&cid=235798146.1762537195&ul=en-us&are=1&frm=0&pscdl=noapi&_prs=gs.rd&_eu=AAAAAAQ&_geo=1&_rdi=1&_s=2&tag_exp=103116026~103200004~104527906~104528501~104684208~104684211~105391252~115616986~115938465~115938468~116988316~117041587&dl=https%3A%2F%2Fwww.marshfieldclinic.org%2Fdoctors%2Felmer-g-lehman-md%3Fek%3Delmer%2520g%2520lehman%2520md&sid=1768691716&sct=7&seg=1&dr=https%3A%2F%2Fwww.marshfieldclinic.org%2Fdoctors&dt=Elmer%20G%20Lehman%20MD&en=telephone_link&_c=1&ep.click_text=1-715-387-5161&ep.click_url=tel%3A1(715)387-5161&_et=1839&tfd=18505
- https://www.marshfieldclinic.org/specialties
- https://www.marshfieldclinic.org/specialties/search?k=Robotic
- https://www.marshfieldclinic.org/specialties/obgyn/robot-assisted-surgery

- https://www.marshfieldclinic.org/specialties/search?k=hysterectomy
- https://www.marshfieldclinic.org/specialties/cancer-care/uterine
- https://www.marshfieldclinic.org/specialties/search?k=catheters
- https://www.marshfieldclinic.org/specialties/anesthesia/anesthesiology-nerve-block
- https://www.marshfieldclinic.org/patient-resources
- https://www.marshfieldclinic.org/patient-resources/billing
- https://pay.marshfieldclinic.org/?_gl=1*zlqd8d*_gcl_au*MTM0OTk4MTAzMi4xNzYyNTM3MTkz
- https://www.google-analytics.com/g/collect?v=2&tid=G-MZ8GZXHC4S&gtm=45je61e1v887275271z877439705za20gzb77439705zd77439705&_p=1768692629534&gcd=13l3l3l3l1l1&npa=0&dma=0&cid=235798146.1762537195&ul=en-us&are=1&frm=0&pscdl=noapi&_eu=AAAAAAQ&_geo=1&_rdi=1&_s=1&tag_exp=103116026~103200004~104527907~104528500~104684208~104684211~105391252~115938465~115938468~115985660~116491844~116988316~117041587&dl=https%3A%2F%2Fwww.marshfieldclinic.org%2Fpatient-resources&sid=1768691716&sct=7&seg=1&dr=https%3A%2F%2Fwww.marshfieldclinic.org%2Fspecialties%2Fanesthesia%2Fanesthesiology-nerve-block&dt=Patient%20Resources%3A%20Billing%2C%20Insurance%2C%20Medical%20Records&en=page_view&tfd=8346
- https://www.marshfieldclinic.org/patient-resources#insurance
- https://www.marshfieldclinic.org/patient-resources/insurance/common-coverage-questions
- https://www.marshfieldclinic.org/patient-resources/insurance/health-insurance-marketplace
- https://www.marshfieldclinic.org/patient-resources/billing/patient-assistance
- https://www.marshfieldclinic.org/patient-resources/billing/financial-assistance
- https://www.marshfieldclinic.org/mPatientResources/Documents/FA-Application-English.pdf
- https://www.google-analytics.com/g/collect?v=2&tid=G-MZ8GZXHC4S&gtm=45je61e1v887275271za20gzb77439705zd77439705&_p=1768693657223&gcd=13l3l3l3l1l1&npa=0&dma=0&cid=235798146.1762537195&ul=en-us&are=1&frm=0&pscdl=noapi&_eu=AEAAAAQ&_geo=1&_rdi=1&_s=3&tag_exp=103116026~103200004~104527907~104528500~104684208~104684211~105391253~115616985~115938466~115938469~117041588&dl=https%3A%2F%2Fwww.marshfieldclinic.org%2F&sid=1768691716&sct=7&seg=1&dt=Marshfield%20Clinic&_tu=KA&en=click&ep.link_id=&ep.link_classes=transparentlink&ep.link_url=https%3A%2F%2Fmarshfieldhealth.iqhealth.com%2F&ep.link_domain=marshfieldhealth.iqhealth.com&ep.outbound=true&_et=2&tfd=23767
- https://marshfieldhealth.iqhealth.com/

234.    Contemporaneously with the interception and transmission of Plaintiff's communications on https://www.marshfieldclinic.org/, Marshfield also disclosed to third parties Plaintiff's personal identifiers, including but not limited to her IP addresses, cookie identifiers, device identifiers and account numbers.

235.    Marshfield never notified Plaintiff that either it or third parties would put individually identifiable patient health information about her past, present, or future health conditions to their own commercial uses. Plaintiff never provided informed consent or written permission allowing Marshfield to send individually identifiable patient health information about her past, present, or future health conditions to Google. Plaintiff never provided informed consent or written permission allowing Marshfield or any third party to put individually identifiable patient health information about her past, present, or future health conditions to their own commercial use.

236.    After using Marshfield's Website and communicating her Private Information, Plaintiff received advertisements for Marshfield services on Facebook and on other websites. Plaintiff did not consent to Marshfield's use or disclosure of her Private Information for advertising or marketing purposes.

237.    Google logs and maintains records of the advertisements it serves to individual users and their devices, including ads delivered on Google-owned properties (such as Google Search, YouTube, and Gmail) and on third-party websites and mobile applications that participate in Google's advertising networks (including, for example, the Google Display Network, AdSense, and AdMob). Plaintiff will seek in discovery the records reflecting the ads related to her medical conditions and treatments that were delivered to her and the Class members, along with associated targeting and delivery data, to fully inform the scope of her claims and damages and the ways in which their Private Information was used for advertising.

238.    Plaintiff provided Private Information to Marshfield and trusted that the information would be safeguarded according to Marshfield's policies and state and federal law.

239.    Plaintiff reasonably expected that her communications with Marshfield via the Website were confidential, solely between herself and Marshfield, and that such communications would not be transmitted to or intercepted by a third party.

240.    By doing so without her consent, Marshfield breached its Privacy Policy and unlawfully disclosed her Private Information.

241.    Plaintiff Pettis suffered damages in form of (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information.

242.    Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Marshfield's possession, is protected, and safeguarded from future unauthorized disclosure.

### REPRESENTATIVE PLAINTIFF HOLLY MATHEWS' EXPERIENCES

243.    As a condition of receiving Marshfield's services, Plaintiff Holly Mathews disclosed Private Information to Marshfield on numerous occasions, and most recently in 2025.

244.    Plaintiff accessed Marshfield's Website on her phone and laptop to receive healthcare services from Marshfield and at Marshfield's direction.

245.    During the relevant time period, when the Defendant's Tracking Tools were present, Plaintiff used Marshfield's website, https://www.marshfieldclinic.org/, to schedule appointments, request information on specific medical services, research providers, pay medical bills, and login to MyChart. The full scope of Marshfield's interceptions and disclosures of

Plaintiff's communications to third parties including but not limited to Google can only be determined through formal discovery. However, Marshfield intercepted at least the following communications about Plaintiff's prospective healthcare. The following long-URLs or substantially similar URLs were sent to third parties via Tracking Tools:

- https://www.marshfieldclinic.org/doctors
- https://www.marshfieldclinic.org/Doctors/Adam-D-Atkins-MD?ek=Adam%20D%20Atkins%20MD
- https://www.google-analytics.com/g/collect?v=2&tid=G-MZ8GZXHC4S&gtm=45je61e1v887275271za20gzb77439705zd77439705&_p=1768693657223&gcd=13l3l3l3l111&npa=0&dma=0&cid=235798146.1762537195&ul=en-us&are=1&frm=0&pscdl=noapi&_eu=AEAAAAQ&_geo=1&_rdi=1&_s=3&tag_exp=103116026~103200004~104527907~104528500~104684208~104684211~105391253~115616985~115938466~115938469~117041588&dl=https%3A%2F%2Fwww.marshfieldclinic.org%2F&sid=1768691716&sct=7&seg=1&dt=Marshfield%20Clinic&_tu=KA&en=click&ep.link_id=&ep.link_classes=transparentlink&ep.link_url=https%3A%2F%2Fmarshfieldhealth.iqhealth.com%2F&ep.link_domain=marshfieldhealth.iqhealth.com&ep.outbound=true&_et=2&tfd=23767
- https://www.marshfieldclinic.org/request-appointment-provider?practitionerid=16224535&cattailsid=225188&name=Adam%20D%20Atkins%20MD
- https://www.marshfieldclinic.org/doctors/search?k=%22Orthopedic%20Surgery%22&ek=Orthopedic%20Surgery
- https://www.marshfieldclinic.org/Doctors/Tamira-J-Miranowski-DO
- https://www.google-analytics.com/g/collect?v=2&tid=G-MZ8GZXHC4S&gtm=45je61e1v887275271z877439705za20gzb77439705zd77439705&_p=1768693895508&gcd=13l3l3l3l111&npa=0&dma=0&cid=235798146.1762537195&ul=en-us&are=1&frm=0&pscdl=noapi&_prs=gs.rd&_eu=AAAAAAQ&_geo=1&_rdi=1&_s=2&tag_exp=103116026~103200004~104527906~104528501~104684208~104684211~105391253~115616985~115938465~115938468~116682877~117041587&dl=https%3A%2F%2Fwww.marshfieldclinic.org%2Fdoctors%2Ftamira-j-miranowski-do&sid=1768691716&sct=7&seg=1&dr=https%3A%2F%2Fwww.marshfieldclinic.org%2Fdoctors%2Fsearch%3Fk%3D%2522Orthopedic%2520Surgery%2522%26ek%3DOrthopedic%2520Surgery&dt=Tamira%20J%20Miranowski%20DO&en=telephone_link&_c=1&ep.click_text=1-715-858-4650&ep.click_url=tel%3A1(715)858-4650&_et=6883&tfd=31918
- https://www.marshfieldclinic.org/locations
- https://www.marshfieldclinic.org/Locations/Centers/Lake%20Hallie%20Center
- https://www.google-analytics.com/g/collect?v=2&tid=G-MZ8GZXHC4S&gtm=45je61e1v887275271z877439705za20gzb77439705zd77439705

39705&_p=1768694072956&gcd=13l3l3l3l111&npa=0&dma=0&cid=235798146
.1762537195&ul=en-
us&are=1&frm=0&pscdl=noapi&_prs=gs.rd&_eu=AAAAAAQ&_geo=1&_rdi=
1&_s=2&tag_exp=103116026~103200004~104527906~104528501~104684208~
104684211~105391253~115938465~115938469~116682875~117041587&dl=htt
ps%3A%2F%2Fwww.marshfieldclinic.org%2Flocations%2Fcenters%2Fflake%20
hallie%20center&sid=1768691716&sct=7&seg=1&dr=https%3A%2F%2Fwww.
marshfieldclinic.org%2Flocations&dt=Centers&en=telephone_link&_c=1&ep.cli
ck_text=715-738-
3700&ep.click_url=tel%3A%2B17157383700&_et=198&tfd=4825

- https://www.marshfieldclinic.org/Locations/Centers/Eau%20Claire%20Oakwood
  %20Center
- https://www.google-analytics.com/g/collect?v=2&tid=G-
  MZ8GZXHC4S&gtm=45je61e1v887275271z877439705za20gzb77439705zd774
  39705&_p=1768694236212&gcd=13l3l3l3l111&npa=0&dma=0&cid=235798146
  .1762537195&ul=en-
  us&are=1&frm=0&pscdl=noapi&_prs=gs.rd&_eu=AAAAAAQ&_geo=1&_rdi=
  1&_s=3&tag_exp=103116026~103200004~104527907~104528500~104684208~
  104684211~105391253~115616986~115938465~115938469~117041587&dl=htt
  ps%3A%2F%2Fwww.marshfieldclinic.org%2Flocations%2Feau%20c
  laire%20oakwood%20center&sid=1768691716&sct=7&seg=1&dr=https%3A%2
  F%2Fwww.marshfieldclinic.org%2Flocations&dt=Eau%20Claire%20Oakwood%
  20Center&en=telephone_link&_c=1&ep.click_text=715-858-
  4200&ep.click_url=tel%3A%2B17158584200&_et=2060&tfd=4317
- https://www.marshfieldclinic.org/doctors/search?k=Primary%20Care
- https://www.marshfieldclinic.org/Doctors/Viachaslau-Kazelka-MD
- https://www.google-analytics.com/g/collect?v=2&tid=G-
  MZ8GZXHC4S&gtm=45je61e1v887275271z877439705za20gzb77439705zd774
  39705&_p=1768694376688&gcd=13l3l3l3l111&npa=0&dma=0&cid=235798146
  .1762537195&ul=en-
  us&are=1&frm=0&pscdl=noapi&_prs=gs.rd&_eu=AAAAAAQ&_geo=1&_rdi=
  1&_s=2&tag_exp=103116026~103200004~104527907~104528500~104684208~
  104684211~105391252~115495938~115938465~115985660~11668
  2877~117041588&dl=https%3A%2F%2Fwww.marshfieldclinic.org%2Fdoctors
  %2Fviachaslau-kazelka-
  md&sid=1768691716&sct=7&seg=1&dr=https%3A%2F%2Fwww.marshfieldcli
  nic.org%2Fdoctors%2Fsearch%3Fk%3DPrimary%2520Care&dt=Viachaslau%20
  Kazelka%20MD&en=telephone_link&_c=1&ep.click_text=1-715-858-
  4277&ep.click_url=tel%3A1(715)858-4277&_et=219&tfd=5486
- https://www.marshfieldclinic.org/patient-resources
- https://www.marshfieldclinic.org/patient-resources/billing
- https://www.google-analytics.com/g/collect?v=2&tid=G-
  2KDC9B8369&gtm=45je61e1v886335340z877439705za20gzb77439705zd7743
  9705&_p=1768694596182&gcd=13l3l3l3l111&npa=0&dma=0&cid=235798146.
  1762537195&ul=en-
  us&are=1&frm=0&pscdl=noapi&_eu=AAAAAAQ&_geo=1&_rdi=1&_s=1&tag

_exp=103116026~103200004~104527907~104528500~104573694~104684208~
104684211~105391253~115495938~115938465~115938468~117041588&dl=htt
ps%3A%2F%2Fwww.marshfieldclinic.org%2Fpatient-
resources%2Fbilling&sid=1768691716&sct=7&seg=1&dr=https%3A%2F%2Fw
ww.marshfieldclinic.org%2Fpatient-
resources&dt=Pay%20Your%20Bill&en=page_view&tfd=7916

246.    Contemporaneously with the interception and transmission of Plaintiff's communications on https://www.marshfieldclinic.org/, Marshfield also disclosed to third parties Plaintiff's personal identifiers, including but not limited to her IP addresses, cookie identifiers, device identifiers and account numbers.

247.    Marshfield never notified Plaintiff that either it or third parties would put individually identifiable patient health information about her past, present, or future health conditions to their own commercial uses. Plaintiff never provided informed consent or written permission allowing Marshfield to send individually identifiable patient health information about her past, present, or future health conditions to Google. Plaintiff never provided informed consent or written permission allowing Marshfield or any third party to put individually identifiable patient health information about her past, present, or future health conditions to their own commercial use.

248.    After using Marshfield's Website and communicating her Private Information, Plaintiff recalls receiving advertisements for Marshfield services on Facebook and on other websites. Plaintiff did not consent to Marshfield's use or disclosure of her Private Information for advertising or marketing purposes.

249.    Google logs and maintains records of the advertisements it serves to individual users and their devices, including ads delivered on Google-owned properties (such as Google Search, YouTube, and Gmail) and on third-party websites and mobile applications that participate in Google's advertising networks (including, for example, the Google Display Network, AdSense, and AdMob). Plaintiff will seek in discovery the records reflecting the ads related to her medical

conditions and treatments that were delivered to her and the Class members, along with associated targeting and delivery data, to fully inform the scope of her claims and damages and the ways in which their Private Information was used for advertising.

250.    Plaintiff provided Private Information to Marshfield and trusted that the information would be safeguarded according to Marshfield's policies and state and federal law.

251.    Plaintiff reasonably expected that her communications with Marshfield via the Website were confidential, solely between herself and Marshfield, and that such communications would not be transmitted to or intercepted by a third party.

252.    By doing so without her consent, Marshfield breached its Privacy Policy and unlawfully disclosed her Private Information.

253.    Plaintiff Pettis suffered damages in form of (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information.

254.    Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Marshfield's possession, is protected, and safeguarded from future unauthorized disclosure

## TOLLING

255.    Any statute of limitations applicable to Plaintiffs' claims has been tolled by Marshfield's actual knowledge and efforts to conceal the misrepresentations and omissions alleged herein.  Through no fault or lack of diligence, Plaintiffs and the Class members had no obvious way to discover Marshfield's deception and unlawful conduct.

256.    Plaintiffs and the Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Marshfield was acting unlawfully. The

earliest Plaintiffs or a reasonable user of Marshfield's Website could have learned of Marshfield's conduct was approximately December 2026, when Plaintiffs' counsel, through an independent technical investigation, identified Google Tracking Tools operating on Marshfield's Website and transmitting user healthcare communications and identifiers to third parties. Marshfield's alleged representations were material to Plaintiffs and the Class members at all relevant times. During any applicable statute of limitations, Plaintiffs and the Class members could not have discovered Marshfield's alleged wrongful conduct through the exercise of reasonable diligence because Marshfield's incorporation of the Tracking Tools is highly technical, undiscoverable by ordinary users of Marshfield's Website, and Marshfield made no disclosures or other indications that would inform a reasonable user of its Website that Marshfield was intercepting and disclosing users' individually-identifiable health information to third parties.

257.    At all relevant times, Marshfield was – and still is – under a continuous duty to disclose to Plaintiffs and the Class members the true nature of the disclosures being made and the lack of an actual "requirement" before it shared Plaintiffs' and the Class members' data with third parties including Google.

258.    Marshfield's knowingly, actively, affirmatively, or negligently concealed the facts alleged herein. Plaintiffs and the Class members reasonably relied on Marshfield's concealment.

259.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Marshfield's concealment, and Marshfield is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

260.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

261.    The Class that Plaintiffs seek to represent is defined as follows:

All people who used Marshfield's Website and had individually-identifiable patient health information about their past, present, or future health conditions shared with Google or other third parties without notice or consent ("the Class members").

262.    Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign and any Judge who adjudicates this case, including their staff and immediate family.

263.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

264.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(1), because the Class members are so numerous and geographically dispersed that their joinder would be impracticable. Plaintiffs believe that Marshfield's and Googles business records will permit the identification of thousands of people meeting the Class definition.

265.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(2), because there are many common questions of facts and law concerning and affecting the Class members, including:

a.  Whether Marshfield had a duty to protect and refrain from disclosing the Class members' individually identifiable health information;

b.  Whether Marshfield intentionally disclosed the Class members' individually identifiable health information to third parties including but not limited to Google;

c.  Whether the Class members consented to Marshfield disclosure of their individually identifiable health information to third parties including but not limited to Google;

d.  Whether the Class members are entitled to damages because of Marshfield's conduct; and

e.  Whether Marshfield's knowing disclosure of its patients' individually identifiable health information to third parties including but not limited to Google is "criminal or tortious" under 18 U.S.C. § 2511(2)(d).

266.    Plaintiffs also anticipate that Defendant will raise defenses common to the Class.

267.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(3), because Plaintiffs' claims are typical of the claims belonging to the Class members. Plaintiffs and the Class members were harmed by the same wrongful conduct perpetrated by Marshfield that caused their individually identifiable health information to be intercepted and disclosed without notice or consent. As a result, Plaintiffs' claims are based on the same facts and legal theories as the Class members' claims.

268.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(4), because Plaintiffs will fairly and adequately protect the interests of all the Class members, there are no known conflicts of interest between Plaintiffs and the Class members, and Plaintiffs have retained counsel experienced in the prosecution of complex litigation.

269.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), because common questions of law and fact predominate over questions affecting the individual Class members, because a class action is superior to other available methods for the fair and efficient adjudication of these claims and because important public interests will be served by addressing the matter as a class action. Further, the prosecution of separate actions by the individual Class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and substantially impair the Class members' ability to protect their interests.

270.    The State of Wisconsin has a significant interest in regulating the conduct of businesses operating within its borders.

271.    Wisconsin, which seeks to protect the rights and interests of Wisconsin and all

residents and citizens of the United States against a company headquartered and doing business in Wisconsin, has a greater interest in the claims of Plaintiffs and the Classes than any other state and is most intimately concerned with the claims and outcome of this litigation.

272.    The principal place of business and headquarters of Marshfield, located in Wisconsin, is the "nerve center" of its business activities—the place where its high-level officers direct, control and coordinate its activities, including major policy, financial and legal decisions.

273.    Upon information and good faith belief, Marshfield's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in Wisconsin.

274.    Marshfield's breaches of duty to Plaintiffs and Class Members emanated from Wisconsin.

275.    Application of Wisconsin law to the Classes with respect to Plaintiffs' and the Classes' common law claims is neither arbitrary nor fundamentally unfair because, further to choice of law principles applicable to this action, the common law of Wisconsin applies to the nationwide common law claims of all Class members. Additionally, given Wisconsin's significant interest in regulating the conduct of businesses operating within its borders, and that Wisconsin has the most significant relationship to Marshfield, as it is headquartered in Wisconsin, there is no conflict in applying Wisconsin law to non-resident consumers such as Plaintiffs and Class Members. Alternatively, and/or in addition to Wisconsin law, the laws set forth below apply to the conduct described herein.

## COUNT I
## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511(1), *et seq.*

276.    Plaintiffs incorporate the allegations contained in the foregoing paragraphs as if fully set forth herein.

277. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

278. The ECPA protects both sending and receipt of communications.

279. The ECPA provides a private right of action to any person whose wire or electronic communications are intercepted. 18 U.S.C. § 2520(a).

280. Marshfield intentionally intercepted electronic communications that Plaintiffs and the Class members exchanged with Marshfield through Tracking Tools installed on Marshfield's Website.

281. The transmissions of data between Plaintiffs and the Class members and Marshfield qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

282. Marshfield contemporaneously intercepted and transmitted Plaintiffs' and the Class members' communications to third parties including but not limited to Google.

283. The intercepted communications include:

    a. the content of Plaintiffs' and the Class members' communications relating to appointments with medical providers;

    b. the content of Plaintiffs' and the Class members' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information;

    c. Button/menu selections and/or content typed into free text boxes; and

    d. Full-string URLs that contain any information concerning the substance, purport, or meaning of patient communications with their health entities.

284. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a. the cookies Marshfield and third parties including Google use to track Plaintiffs' and the Class members' communications;

b.   Plaintiffs' and the Class members' browsers;

c.   Plaintiffs' and the Class members' computing devices;

d.   Marshfield's web-servers or webpages where Tracking Tools are present;

e.   Google's web-servers; and

f.   the Google Analytics, Google Ads, DoubleClick, and other Google advertising and analytics scripts embedded in Marshfield's webpages, which intercept and transmit Plaintiffs' and the Class members' communications to Google.

285.    Google and other third parties are not parties to Plaintiffs' and the Class members' communications with Marshfield.

286.    Marshfield transmits the content of Plaintiffs' and the Class members' communications to third parties including Google through the surreptitious redirection of those communications from Plaintiffs' and the Class members' computing devices.

287.    Plaintiffs and the Class members did not consent to third parties including Google's acquisition of their appointment and treatment communications with Marshfield.

288.    Third parties like Google did not obtain legal authorization to obtain Plaintiffs' and the Class members' communications with Marshfield relating to communications with their health entities.

289.    Google did not require Marshfield to obtain the lawful rights to share the content of Plaintiffs' and the Class members' communications relating to appointments and treatments.

290.    Any purported consent that Google received from Marshfield to obtain the content of Plaintiffs' and the Class members' communications was not valid.

291.    In disclosing the content of Plaintiffs' and the Class members' communications relating to treatments, conditions, and appointments, Marshfield had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions including:

    a.  the unauthorized disclosure of individually identifiable health information is tortuous in and of itself regardless of whether the means deployed to disclose the information violates the Wiretap Act or any subsequent purpose or use for the acquisition. Marshfield intentionally committed a tortious act by disclosing individually identifiable health information without authorization to do so.

    b.  the unauthorized acquisition of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health information. Marshfield intentionally violated 42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization.

    c.  a violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offensive punishable by fine or imprisonment with *increased penalties* where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain." Marshfield intentionally violated the enhanced penalty provision of 42 U.S.C. § 1320d-6 by disclosing the individually identifiable health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain."

    d.  trespass upon Plaintiffs' and the Class members' personal and private property via the placement of Google Analytics, Google Ads, DoubleClick, and related Google advertising and analytics cookies—including, but not limited to, IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC on Plaintiffs' and the Class members' personal computing devices;

    e.  the requirement under 410 ILCS § 5/30 that healthcare providers maintain the confidentiality of patient health records; and

    f.  violation of the federal wire fraud statutes at 18 U.S.C. §§ 1343 (fraud by wire, radio, or television) and 1349 (attempt and

conspiracy), which prohibit a person from "devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate … commerce, any writing, signs, signals, pictures, or sounds for purpose of executing such scheme or artifice."

292.    The federal wire fraud statute, 18 U.S.C. § 1343, has four elements: (1) that the defendant voluntarily and intentionally devised a scheme to defraud another out of money or property; (2) that the defendant did so with the intent to defraud; (3) that is was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used. The attempt version of the wire fraud statute provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349.

293.    Any party exception in 18 U.S.C. § 2511(2)(d) does not apply. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Marshfield violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information to a third party.

294.    Plaintiffs' and Class Members' information that Marshfield disclosed to third parties qualifies as IIHI, and Marshfield violated Plaintiff's expectations of privacy, and constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Marshfield intentionally used the wire or electronic communications to increase its profit margins.

Marshfield specifically used the Tracking Tools and other codes to track and utilize Plaintiffs' and Class members' Private Information for its own financial benefit.

295.    Plaintiffs and Class members did not authorize Marshfield to acquire the content of their communications for purposes of invading Plaintiffs' and Class members' privacy via Tracking Tools. Plaintiffs and Class members had a reasonable expectation that Marshfield would not re-direct their communications content others attached to their personal identifiers in the absence of their knowledge or consent.

296.    Any purported consent that Marshfield received from Plaintiffs and Class members was not valid.

297.    Marshfield's scheme or artifice to defraud in this action further consists of the false and misleading statements and omissions in its privacy policies set forth above, including the statements and omissions recited in the breach of contract and negligence claims below

298.    Marshfield acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and the Class members' property:

        a.  property rights to the confidentiality of their individually identifiable health information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes; and

        b.  property rights to determine who has access to their computing devices.

299.    Marshfield acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and the Class members' property:

        a.  with knowledge that (1) Marshfield did not have the right to share such data without written authorization; (2) courts had determined that a healthcare providers' use of similar Tracking Tools gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable user would not

70

understand that Google was collecting their individually-identifiable health information based on their activities on Marshfield's Website; and (4) the subsequent use of health information for advertising was a further invasion of such property rights in making their own exclusive use of their individually-identifiable health information for any purpose not related to the provision of their healthcare; and

b. with the intent to (1) acquire Plaintiffs and the Class members' individually-identifiable health information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; and (2) use Plaintiffs' and the Class members' individually-identifiable health information without their authorization.

300. Plaintiffs and the Class members have suffered damages because of Marshfield's violations of the ECPA that include:

a. Marshfield eroded the essential, confidential nature of the provider-patient relationship;

b. Marshfield failed to provide Plaintiffs and the Class members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information;

c. Marshfield derived valuable benefits from using and sharing the contents of Plaintiffs' and the Class members' communications on its Website without their knowledge or informed consent, and without providing any compensation for the information it used or shared;

d. Marshfield's actions deprived Plaintiffs and the Class members of the value of their individually identifiable health information;

e. Marshfield's actions diminished the value of Plaintiffs' and the Class Members' property rights in their individually identifiable health information; and

f. violating Plaintiffs' and the Class members' privacy rights by sharing their individually identifiable health information for commercial use.

301.    For Marshfield's violations set forth above, Plaintiffs and the Class members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Marshfield] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

302.    Unless enjoined, Marshfield may continue to commit the violations of law alleged here.

303.    Plaintiffs want to continue to communicate with their healthcare providers through online platforms but have no practical way of knowing if their communications are being intercepted and disclosed to Google, and thus continue to be at risk of harm from Marshfield's conduct.

304.    Pursuant to 18 U.S.C. § 2520, Plaintiffs and the Class members seek monetary damages for the *greater of* (i) the sum of the actual damages suffered by the plaintiffs and any profits made by Marshfield as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

## COUNT II
## NEGLIGENCE

305.    Plaintiffs re-allege and incorporate by reference all prior paragraphs as if fully set forth herein.

306.    Defendant owed a duty to Plaintiffs and the Class to exercise due care in collecting, storing, safeguarding, and preventing any disclosure of their Private Information. This duty included but was not limited to: (a) preventing Plaintiffs' and Class Members' Private Information from being to be disclosed to unauthorized third parties; and (b) destroying Plaintiffs' and Class

Members' Private Information within an appropriate amount of time after it was no longer required by Defendant.

307.    Defendant's duties to use reasonable care arose from several sources, including those described below. Defendant had a common law duty to prevent foreseeable harm to others, including Plaintiffs and Class Members, who were the foreseeable and probable victims of any data misuse, such as disclosure of Private Information to unauthorized parties.

308.    Defendant had a special relationship with Plaintiffs and Class Members, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members resulting from unauthorized disclosure of their Private Information to third parties such as Google. Plaintiffs and Class Members were compelled to entrust Defendant with their Private Information. At relevant times, Plaintiffs and Class Members understood that Defendant would take adequate data storage practices to safely store their Private Information. Only Defendant had the ability to protect Plaintiffs' and Class Members' Private Information collected and stored on Defendant's websites.

309.    Defendant's duty to use reasonable measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of [PHI]." 45 C.F.R. § 164.530(c)(1).

310.    Defendant's conduct as described above constituted an unlawful breach of their duty to exercise due care in collecting, storing, and safeguarding Plaintiffs' and the Class Members' Private Information by failing to protect this information.

311.    Plaintiffs and the Class Members trusted Defendant and in doing so provided Defendant with their Private Information, based upon Defendant's representations that it would "maintain the privacy of your health information" and it "must obtain your written authorization before using your health information to send any marketing materials to you". Defendant failed to do so.

312.    Defendant breached its duty in this relationship to collect and safely store Plaintiffs' and Class Members' Private Information.

313.    Plaintiffs' and the Class Members' Private Information would have remained private and secure had it not been for Defendant's wrongful and negligent breach of their duties. Defendant's negligence was, at least, a substantial factor in causing Plaintiffs' and Class Members' Private Information to be improperly accessed, disclosed, and otherwise compromised, and in causing Plaintiffs and the Class Members other injuries because of the unauthorized disclosures.

314.    The damages suffered by Plaintiffs and the Class Members were the direct and reasonably foreseeable result of Defendant's negligent breach of their duties to maintain Users' Private Information. Defendant knew or should have known that their unauthorized disclosure of highly sensitive Private Information was a breach of their duty to collect and safely store such information.

315.    Defendant's negligence directly caused significant harm to Plaintiffs and the Class. Specifically, Plaintiffs and Class Members are now subject to their sensitive information being accessed by unauthorized parties, which may lead to significant harms.

316.    Defendant had a fiduciary duty to protect the confidentiality of its communications with Plaintiffs and Class Members by virtue of the explicit privacy representations Defendant made on their websites to Plaintiffs and members of the Class.

317.    Defendant had information relating to Plaintiffs and Class Members that they knew or should have known to be confidential.

318.    Plaintiffs' and Class Members' communications with Defendant about sensitive Private Information and their status as patients of Defendant were not matters of general knowledge.

319.    Defendant breached its fiduciary duty of confidentiality by designing their data protection systems in a way to allow for a data breach of a massive caliber.

320.    At no time did Plaintiffs or Class Members give informed consent to Defendant's conduct.

321.    As a direct and proximate cause of Defendant's actions, Plaintiffs and Class Members suffered damage in that the information they intended to remain private is no longer so and their Private Information was disclosed to, tracked, and intercepted by third-party Internet tracking companies, including Google, without their knowledge or consent.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Lisa Marie Petts and Holly Mathews, on behalf of themselves and all those similarly situated, respectfully prays for judgment in their favor and against Defendant Marshfield as follows:

- For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

- For equitable relief enjoining Marshfield from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and other Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and other Class Members;

- For equitable relief compelling Marshfield to utilize appropriate methods and policies with respect to consumer data collection, storage and safety, and to disclose with specificity the type of PII

and PHI disclosed to third parties;

- For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Marshfield's wrongful conduct;

- For an award of actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined as allowable by law;

- For an award of punitive damages as allowable by law;

- For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

- Pre- and post-judgment interest on any amounts awarded and

- All such other and further relief as this court may deem equitable and just.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand that this matter be tried before a jury.


Date: February 11, 2026                    Respectfully submitted,


/s/ *Summer Murshid*
Summer Murshid
Hawks Quindel S.C.
5150 N. Port Washington Rd., Suite 243
Milwaukee, Wisconsin, 53217
414-376-5018


/s/ *James B. Zouras*
James B. Zouras (*pro hac vice* forthcoming)
Ryan F. Stephan (*pro hac vice* forthcoming)
Michael Casas (*pro hac vice* forthcoming)
STEPHAN ZOURAS, LLC
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
Firm ID: 43734
jzouras@stephanzouras.com

rstephan@stephanzouras.com
mcasas@stephanzouras.com

*Attorneys for Plaintiffs and the Putative Class*